*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

JACK CHRIS BIERI,

       Defendant-Appellant.

UNPUBLISHED
January 22, 2019

No. 332376
Midland Circuit Court
LC No. 15-006074-FC

## ON REMAND

Before: CAVANAGH, P.J., and METER and M. J. KELLY, JJ.

PER CURIAM.

In our prior opinion in this case, we affirmed defendant's convictions of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a), and one count of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a). This case now returns to this Court on remand from our Supreme Court for consideration of the trial court's denial of defendant's pretrial motion for state funds to procure an independent DNA expert. Applying the standard set forth in *People v Kennedy*, 502 Mich 206; 917 NW2d 355 (2018), we conclude that the trial court did not err by denying defendant's motion. Accordingly, we affirm defendant's convictions.

## I. PROCEDURAL HISTORY

The basic facts underlying these proceedings were set forth in detail in our prior opinion:

The complainant, JE, was 11 years old in December 2014. Defendant, who was in a relationship with the complainant's mother at the time, had moved into their home in or around November 2014. On December 31, the complainant's mother drank alcohol and defendant gave the complainant's mother some type of medication, perhaps Paxil. JE was on prescription medication, including a sleep aid, which she took on December 31. JE went to bed around 11:30 p.m. in her mother's bedroom. The complainant's mother took a shower sometime after that, and while she was in the shower, defendant called to her

several times, asking whether she was "done yet." When she got out of the shower but was still in the bathroom, the complainant's mother heard defendant talking to JE, so she looked in the bedroom and saw defendant rubbing JE's back and shoulders and asking her repeatedly, "Are you doing good? Are you all right? Doing good?"

Later that evening, defendant left the living room, where he had been with the complainant's mother. During his absence, the complainant's mother needed to use the bathroom, and when she got to the bathroom she heard defendant in her bedroom again. The complainant's mother testified that she "peeked" in the bedroom, where she again saw defendant rubbing JE's back and shoulders and asking her whether she was all right. At some point after that, defendant suggested that the three of them watch a movie together in the bedroom. The complainant's mother and defendant joined JE on the bed, with JE in between her mother and defendant. Defendant shared a blanket with JE while her mother had a separate blanket. The complainant's mother began to fall asleep, but she remembered that at some point, JE left to take a shower, complaining that she felt "really dirty."

The next morning, JE told her mother that defendant had "had sex with her." The complainant's mother took JE to the hospital, where she was examined by a sexual assault nurse examiner (SANE) and treated for a genital laceration. According to the nurse, the laceration was probably caused by a forced penetration. The nurse also testified that JE told her that she had been sleeping when defendant "pulled down his pants, then he pulled down her pants on the bed and put his private parts in her private parts." JE also told her that defendant had "licked my pee-pee," fondled her "[i]n my pee-pee and my butt," and "French kissed" her on the mouth, neck, and ear. According to the nurse, JE also stated that defendant "told her not to tell her mom and to keep it a secret." [*People v Bieri*, unpublished per curiam opinion of the Court of Appeals, issued August 3, 2017 (Docket No. 332376), p 1-2.]

As noted already, the jury found defendant guilty of two counts of CSC-I and one count of CSC-II. The trial court sentenced defendant to 450 months to 70 years in prison for both counts of CSC-I and 172 months to 70 years in prison for the CSC-II conviction. Defendant appealed his convictions to this Court, arguing that he was unconstitutionally deprived of the effective assistance of counsel and that the trial court erred by denying his request for state funds to pay for an independent DNA expert. We denied both claims.

After we released our prior opinion, our Supreme Court decided *Kennedy*, 502 Mich 206, which clarified the standard that the trial court should apply when analyzing a criminal defendant's request for state funding to procure expert assistance with his or her defense. Defendant applied for leave to appeal our prior opinion to the Supreme Court. In lieu of granting leave, our Supreme Court vacated that part of our "judgment addressing the denial of the defendant's pretrial request for funds to pay for an independent DNA expert" and remanded the case to this Court for reconsideration of that issue in light of *Kennedy*. *People v Bieri*, ___ Mich ___, ___; 919 NW2d 270, 270-271 (2018). Our Supreme Court denied leave to appeal in "all

other respects." *Id*. at ___; 919 NW2d at 271. Hence, the only issue now before this Court is whether the trial court erred by denying defendant's request for state funds to pay for an independent DNA expert.

## II. *PEOPLE V KENNEDY*

Before our Supreme Court's holding in *Kennedy*, issues regarding the funding of experts at state expense were decided under MCL 775.15.[1] *Kennedy*, 502 Mich at 220. See also *People v Jacobsen*, 448 Mich 639, 641; 532 NW2d 838 (1995); *People v Tanner*, 469 Mich 437, 442-443; 671 NW2d 728 (2003). MCL 775.15, however, "by its express terms, does not provide for the appointment of expert witnesses. It merely provides a means for subpoenaing certain witnesses and for paying their cost of attending trial." *Kennedy*, 502 Mich at 222. Rather than invoking the court's subpoena power, parties usually invite an expert witness to participate in the proceedings and pay the expert a fee for his or her assistance. See *id*. at 222-223. Thus, recognizing the distinction between *compelling* a lay witness to testify and *engaging* an expert, our Supreme Court concluded in *Kennedy*, 502 Mich at 225, that "the Legislature did not intend MCL 775.15 to encompass requests by an indigent criminal defendant for the appointment of an expert at government expense." Accordingly, our Supreme Court overruled its prior decisions to the extent that they applied MCL 775.15 to a defendant's request for state funds to procure an expert. *Id*.

Following *Kennedy*, an indigent defendant's request for state funds to pay for an expert is analyzed under the due-process framework set forth in *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985). *Kennedy*, 502 Mich at 225. In *Ake*, 470 US at 77, the federal Supreme Court recognized that "fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversarial system." (Internal citation and

---

[1] MCL 775.15 provides:

> If any person accused of any crime or misdemeanor, and about to be tried therefore in any court of record in this state, shall make it appear to the satisfaction of the judge presiding over the court wherein such trial is to be had, by his own oath, or otherwise, that there is a material witness in his favor within the jurisdiction of the court, without whose testimony he cannot safely proceed to a trial, giving the name and place of residence of such witness, and that such accused person is poor and has not and cannot obtain the means to procure the attendance of such witness at the place of trial, the judge in his discretion may, at a time when the prosecuting officer of the county is present, make an order that a subpoena be issued from such court for such witness in his favor, and that it be served by the proper officer of the court. And it shall be the duty of such officer to serve such subpoena, and of the witness or witnesses named therein to attend the trial, and the officer serving such subpoena shall be paid therefore, and the witness therein named shall be paid for attending such trial, in the same manner as if such witness or witnesses had been subpoenaed in behalf of the people. [See also *Kennedy*, 502 Mich at 220-221.]

quotation marks omitted). See also *Kennedy*, 502 Mich at 214. Accordingly, the *Ake* court, 470 US at 77, held that the Fourteenth Amendment requires the state to provide the "basic tools of an adequate defense or appeal . . . to those defendants who cannot afford to pay for them." (Internal citation and quotation marks omitted). See also *Kennedy*, 502 Mich at 214.

Thus, when faced with an indigent defendant's request for government funding, due process requires the trial court to weigh the following factors:

> (1) "the private interest that will be affected by the action of the State," (2) "the governmental interest that will be affected if the safeguard is to be provided," and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." [*Kennedy*, 502 Mich at 214-215, quoting *Ake*, 470 US at 77. See also *Matthews v Eldridge*, 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976).]

Regarding the first two factors, the interests of the state and the defendant will generally converge in a criminal case which places the defendant's liberty at risk—the accuracy of the proceedings being the chief concern. *Id*. at 215-216. Therefore, the third due-process factor—the probable value of the requested safeguard—will usually determine whether the defendant is entitled to state fees to pay for an expert. See *id*. at 216-220.

In addressing this third due-process factor, the standard the trial court should employ is one of reasonable probability. *Id*. at 226-228. Under this standard:

> [A] defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather . . . a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial. Thus, if a defendant wants an expert to assist his attorney in confronting the prosecution's proof—by preparing counsel to cross-examine the prosecution's experts or by providing rebuttal testimony—he must inform the court of the nature of the prosecution's case and how the requested expert would be useful. At the very least, he must inform the trial court about the nature of the crime and the evidence linking him to the crime. . . . In each instance, the defendant's showing must also include a specific description of the expert or experts desired; without this basic information, the court would be unable to grant the defendant's motion, because the court would not know what type of expert was needed. [*Id*. at 227, quoting *Moore v Kemp*, 809 F2d 702, 712 (CA 11, 1987) (brackets and first ellipsis in original).

The defendant is required to demonstrate "why the particular expert is necessary." *Id*., quoting *Moore*, 809 F2d at 712. While the defendant is not required to provide a detailed analysis of the specific scientific evidence the expert may provide, the defendant is obligated to "provide the

court with as much information as possible concerning the usefulness of the requested expert to the defense's case." *Id*., quoting *Moore*, 809 F2d at 712.

## III. ANALYSIS

We review de novo, as an issue of constitutional law implicating a defendant's due-process rights, the trial court's grant or denial of a defendant's request for state funds to procure an expert. *People v Cain*, 238 Mich App 95, 108; 605 NW2d 28 (1999). We must consider whether, based upon the defendant's explanation as to why he needed the expert, the trial court should have concluded that state funds were necessary to afford the defendant a fair opportunity to confront the prosecution's evidence and present his defense. See *Moore*, 809 F2d at 710.

Here, defendant was notified before trial of the DNA evidence against him. The prosecution's witness list included several forensic scientists and DNA analysts. At a pretrial hearing, the prosecution informed the trial court that DNA analysis was performed on two swabs from the victim. A DNA-analysis report was provided to defendant. Two DNA profiles were found on an oral swab of the victim and defendant's DNA matched one of these profiles. Additionally, a partial DNA profile from a swab of the victim's underwear matched defendant's DNA within a probability of one in 2,457.

Defendant moved the trial court *in pro per* for state funds to hire an independent forensics laboratory to retest the DNA evidence. Defendant argued that the evidence changed hands on three or four occasions and that he was concerned that the evidence had been tampered with. The trial court denied the request. Because defendant did not show a reasonable probability that the expert was necessary to assist the defense or that the absence of the expert would render the trial fundamentally unfair, we affirm the trial court's ruling.

It is important to note that the only argument defendant raised before the trial court was that the evidence could have been tampered with during one of the exchanges before testing. Defendant claimed that further DNA testing was necessary to prove or disprove this argument. Yet, as the prosecution points out, if the DNA evidence was contaminated before the original testing, subsequent testing would be unlikely to produce a different result. Practically, defendant's tampering argument posits that someone in the chain of custody placed something in the sample that yielded the positive result. Defendant, however, did not argue that testing exists that can differentiate between DNA present at the time of the offense and DNA subsequently added to the sample. Thus, defendant failed to show that further testing of the sample would be useful to his tampering argument.

Moreover, the record shows that an expert was not necessary for defendant to present this argument. The prosecution informed defendant before trial that its witnesses would testify regarding the DNA samples' chain of custody. Defendant did not argue that his counsel was unprepared to cross examine these witnesses on their handling of the evidence or that defense counsel was otherwise unprepared to challenge the admission of the DNA evidence. Additionally, several forensic experts were listed on the prosecution's witness list and were available for defendant to discover. Defendant did not argue that these experts were unequipped to address the potential of contamination in the samples or to address whether evidence of

contamination was revealed by the DNA analysis. Similarly, defendant did not argue that his counsel was ill prepared to cross examine these witnesses on the subject.

Accordingly, defendant failed to show the trial court that an expert would provide him with anything that he could not already receive through the prosecution's witnesses. See *Stephens v Kemp*, 846 F2d 642, 647 (CA 11, 1988) (concluding that the reviewing court may inquire whether the information beneficial to the defendant was available through the state's experts). Therefore, defendant cannot show that a state-funded expert was necessary to afford him a fair opportunity to confront the prosecution's evidence and present his defense. *Moore*, 809 F2d at 710.

In his brief on appeal, defendant presents additional reasons why an expert was necessary to his defense. Defendant argues that he sought an expert to counsel his attorney regarding the accuracy of the techniques employed by the DNA analysts and the likelihood of transferring DNA through means other that sexual assault. Defendant, however, did not raise these additional arguments before the trial court. Thus, because we must evaluate the "trial judge's action at the time he took it," these arguments are immaterial to our analysis. *Moore*, 809 F2d at 710. See also *Conklin v Schofield*, 366 F3d 1191, 1208 (CA 11, 2004) ("In determining the reasonableness of the trial court's refusal to provide independent expert assistance, we consider only the facts available to the trial judge when he made a ruling on the particular motion.").

Finally, defendant argues that defense counsel was ineffective for failing to assist defendant in preparing his motion for a state-funded expert. As noted previously, defense counsel did not participate in defendant's motion for a state-funded expert. In our prior opinion, we rejected this claim of ineffective assistance. *Bieri*, unpub op at 6-7. We noted that defendant had not provided any evidence suggesting that the DNA testing in this case was not scientifically reliable and that the prosecution's case did not rest solely upon the DNA evidence. *Id*. at 7. Thus, we concluded that counsel was not ineffective for choosing not to pursue a state-funded independent DNA expert. *Id*.

Our Supreme Court's remand order limits our consideration to that part of our "judgment addressing the denial of the defendant's pretrial request for funds to pay for an independent DNA expert" in light of its decision in *Kennedy*. *Bieri*, ___ Mich at ___; 919 NW2d at 270-271. As explained earlier, the *Kennedy* court clarified the standard by which a trial court analyzes a defendant's request for state funding to procure an expert. *Kennedy*, however, does not address an attorney's choice not to seek state funding. Similarly, *Kennedy* does not address any claim of ineffective assistance. Thus, *Kennedy* does not call into question our prior conclusion that defense counsel was not ineffective for failing to move for a state-funded expert. Thus, defendant's ineffective-assistance argument is outside the scope of our Supreme Court's remand order and will not be addressed by this Court. See *People v Kincade (On Remand)*, 206 Mich App 477, 481; 522 NW2d 880 (1994).

Affirmed.

/s/ Mark J. Cavanagh
/s/ Patrick M. Meter
/s/ Michael J. Kelly